

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:ANR
F. #2022R00871

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 21, 2026

By ECF and Email

The Honorable Nina R. Morrison
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Quadri Garnes
>        Criminal Docket No. 22-CR-487 (S-1) (NRM)

Dear Judge Morrison:

The government respectfully submits this sentencing memorandum in advance of the defendant Quadri Garnes's sentencing, which is scheduled for May 28, 2026, at 11:00 a.m., and in response to the defendant's sentencing submission. *See* ECF Dkt. 83 (hereinafter "Def. Mem."). Following a four-day jury trial, the defendant was found guilty of transmission of threats to injure in violation of Title 18, United States Code, Section 875(c).[1] For the reasons set forth below, the government respectfully submits that the Court impose a sentence of 24 months' imprisonment, which is within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range.

I.      Background

A.  Offense Conduct[2]

The defendant's conduct is explained in the Probation Department's Presentence Investigation Report, dated February 25, 2026 ("PSR"). (PSR ¶ 1).

---

[1]      At the conclusion of trial, the defendant moved for a judgment of acquittal with respect to both counts charged in the superseding indictment. The Court granted the defendant's motion with respect to Count One. As such, only Count Two, transmission of threats to injure, was submitted to the jury.

[2]      References to the trial transcript are referred to as "Tr." References to government exhibits admitted at trial are referred to as "GX."

The evidence at trial proved that on September 29, 2022, during a recorded conversation (the "Call") with the New York State Department of Labor ("DOL"), the defendant made numerous threats to shoot and kill DOL employees once he realized he was not eligible for unemployment benefits. The defendant's threats included the following:

- "And, and y'all gonna make me go to jail for killing somebody or to prison." GX 1E.
- "Do the city want me to kill five or six different people just because I can't pay my rent?" GX 1K.
- "No, believe me, I'll be at the New York State Department of Labor down on, on, on Schermerhorn or Livingston Street and I will make a big fucking deal out of it." GX 1N.
- "Somebody might get shot today coming out of Department of Labor." GX 1R.

During the Call, the defendant also threatened to "shoot up" the post office where he had previously worked before being terminated. The defendant's threats also included the following:

- "If I go back to the post office, I'm gonna shoot somebody." GX 1S
- "So I gotta go to the post office and shoot the post office up. Right? That's what it, that's what it means, I gotta shoot the post office up?" GX 1P

As part of his threats on the Call, the defendant discussed his purported criminal history, the time he had spent incarcerated, and his ability to carry a firearm. GX 1L, 1U, 1V. On the Call, the defendant repeatedly reminded DOL representative Douglas Hammond that he should remember his name and that he might see the defendant on evening television. GX 1M. Hammond testified that he believed the defendant would carry out his threats, in part because the defendant suggested that Hammond would hear about his violence on the news. Tr. 88, 91. During the Call, the defendant also continually expressed his willingness to return to jail. GX 1Q. Hammond testified that the defendant's willingness to return to jail, several references to his criminal history, and statements about time spent in multiple prisons made the threats credible. Tr. 93-94. Throughout his testimony, Hammond stated that he believed the defendant would carry out his threats to harm and kill others, including DOL employees. Tr. 87-88, 91-94. United States Postal Service ("USPS") supervisor Patricia Reid testified that she and the other employees at the post office where the defendant worked had been notified by law enforcement that the defendant had made threats to the post office. Tr. 198. Reid testified that because of the defendant's threats to the post office she was "scared" and believed that she "could have been shot or killed." Tr. 201-02.

B.  Defendant's Criminal History

The defendant's criminal history, outlined below, exhibits a pattern of failure to comply with the law, despite numerous prosecutions and sentences of incarceration.

2

On December 11, 1992, the defendant was arrested in connection with a petit larceny charge in Schenectady, New York. On December 14, 1992, the defendant received 3 days' incarceration for this crime. (PSR ¶ 24).

On September 24, 1993, the defendant was arrested in Queens, New York for charges related to rape, sexual abuse, assault, and robbery. For this conduct on January 13, 1994, the defendant received several concurrent sentences, ranging from 12 months to 54 months' custody. While incarcerated for these charges, the defendant received several disciplinary infractions. (*Id.* ¶ 25).

On July 22, 1998, the defendant was arrested for attempted burglary in the third degree in Queens, New York. On September 22, 1998, the defendant was sentenced to a range of 18 months to three years' incarceration. (*Id.* ¶ 26).

On February 17, 2004, the defendant was arrested in Brooklyn, New York, for attempted criminal possession of a loaded firearm in the third degree. According to the New York City Police Department ("NYPD") arrest report and court records, on February 17, 2004, an officer recovered a loaded 9-millimeter semiautomatic pistol from the ground after the defendant attempted to discard it. During his arrest, the defendant resisted arrest, refused to be handcuffed, repeatedly punched the NYPD officer in the torso, and shoved him. (*Id.* ¶ 27). On September 9, 2004, the defendant was sentenced to three years' incarceration for these crimes. The defendant was eventually paroled but absconded from supervision in 2008 and 2010. (*Id.*).

## II.    Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." *United States v. Aldeen*, 792 F.3d 247, 251-52 (2d Cir. 2015), *as amended* (July 22, 2015) (quoting 18 U.S.C. § 3553(c)(2)).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

3

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct; [and]

    (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

III.    <u>Guidelines Calculation</u>

The government agrees with the United States Probation Department's ("Probation") calculation of the defendant's base offense level in the PSR to be 14, which includes a two-level increase for multiple threats under U.S.S.G. § 2A6.1(b)(2)(A), as further discussed below. (PSR ¶¶ 15, 22). The government also agrees with Probation's determination that the defendant falls in Criminal History Category II. (*Id.* ¶ 28). Based on a Criminal History Category of II, an offense level of 14 carries an advisory Guidelines range of 18 to 24 months' imprisonment. (*Id.* ¶ 65).

A.  A Two-Level Increase for Multiple Threats Applies Under U.S.S.G. § 2A6.1(b)(2)(A)

The defendant argues that the two-level enhancement under U.S.S.G.§2A6.1(b)(2)(A) does not apply because his statements were made during a single phone call to one victim, the DOL, rather than multiple distinct threats.  Def. Mem. at 3-4.  The defendant is incorrect.  The multiple threats enhancement should apply because the defendant's statements during the Call were not a single threatening remark; rather, they consisted of several distinct threats to commit acts of deadly violence against different victims, specifically the DOL and the post office, over the course of an extended conversation.  Nothing in Section 2A6.1(b)(2)(A) requires separate communications, separate days, or separate victims.  The relevant determination for the Court is whether the "offense involved more than two threats."  U.S.S.G. § 2A6.1(b)(2)(A).  The defendant issued at least six separate threats to both the DOL and the post office as described above, which warrants the application of the multiple threat enhancement.

Courts interpreting Section 2A6.1(b)(2)(A) have held that the enhancement applies where a defendant makes multiple threatening statements during a course of conduct, even if those threats arise from a single communication.  *See United States v. Scott*, 441 F.3d 1322, 1327 (11th Cir. 2006) (holding that 2A6.1(b)(2)(A) properly applied because "multiple threats in [a single] mailing were distinct in their nature and purpose."); *United States v. Stokes*, 347 F.3d 103, 106 (4th Cir. 2003) (noting that "[t]here may be cases in which multiple threats issued within a single letter or conversation are so distinct in nature and purpose that they should not be treated as a single threat for purposes of § 2A6.1(b)(2)").

B.  A Two-Level Reduction for Acceptance of Responsibility Is Not Appropriate Under U.S.S.G. § 3E1.1

The defendant argues that he should receive a two-level acceptance of responsibility reduction in his offense level under U.S.S.G. § 3E1.1 despite having contested his guilt and proceeded to trial.  Def. Mem. at 4-5.  As relevant here, if a defendant clearly demonstrates acceptance of responsibility for his offense, his offense level should be decreased by two levels.  *See* U.S.S.G. § 3E1.1(a).

Section 3E1.1(a) most commonly applies in cases where a defendant pleads guilty and accepts responsibility for his conduct as part of a plea agreement.  Indeed. Application Note 2 to § 3E1.1 provides that the reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  However:

> In rare situations, a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

5

U.S.S.G. § 3E1.1 application note 2.  Ultimately, the defendant bears the burden of showing that the acceptance of responsibility reduction is warranted.  *United States v. Chu*, 714 F.3d 742 (2d Cir. 2013).

The two-level acceptance of responsibility reduction the defendant seeks pursuant to U.S.S.G. § 3E1.1 is unwarranted here.  The Application Notes make clear that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  U.S.S.G. § 3E1.1, Application Note 2; *see also United States v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013) (affirming district court's decision not to apply acceptance of responsibility adjustment because defendant contested his guilt at trial by arguing in summation that he lacked criminal intent); *United States v. Kamara*, 85 F. App'x 231, 232-33 (2d Cir. 2003) (affirming district court's rejection of acceptance of responsibility adjustment because defendant's expression of remorse for his conduct only occurred "after the jury found him guilty"); *United States v. Castano*, 999 F.2d 615, 617 (2d Cir. 1993) (per curiam) (holding that defendant was not entitled to acceptance of responsibility adjustment where "nothing in the record indicates that [defendant] had any purpose in going to trial other than to deny his factual guilt").

The Application Notes recognize that conviction by trial "does not automatically preclude a defendant from consideration for such a reduction," but caution that the Court should only apply the adjustment after conviction by trial in "rare situations," such as "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt."  U.S.S.G. § 3E1.1, Application Note 2.  In such instances, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."  *Id.*

The defendant now attempts to characterize his trial posture as merely preserving legal arguments unrelated to factual guilt, but the record demonstrates otherwise.  The defendant put the government to its burden at trial on the core issue of whether his statements constituted "true threats" under Section 875(c), an issue that necessarily turned on the context, meaning, and seriousness of his statements, as well as his intent and the way in which his words would be understood by others.  Throughout trial, defense counsel vehemently contended that the defendant's statements were not "true threats."  *See* Tr. 52-53 (describing the defendant's conduct as "venting" and as an "angry rant but one that did not cross that crucial important constitutional line between free speech and true threats of injury."); Tr. 54 (maintaining that the defendant "was not making true threats to injure."); Tr. 57 (posing to the jury "whether Quadri Garnes made true threats or was just venting."); Tr. 530 ("So is it possible or even likely [the defendant] was blowing a lot of smoke out of anger, he was venting? It's not a good look, but it doesn't make it a federal crime."); Tr. 540 (characterizing the defendant's statements as "not direct statements" and instead as "the epitome of just, this is what people do sometimes when they just lose it.").

In doing so, the defendant contested the factual basis of the charges, the essential aspects of the government's proof and sought acquittal on both counts at the close of the government's case and again post-verdict.  Further, the defendant contested his guilt, including by cross-examining each government witness, including one victim who testified that she believed she could have been killed in light of the defendant's threats.  *See United States v. Rocha*, 145 F.4th 1247, 1264 (10th Cir. 2025) ("[a]lthough a defendant has a constitutional right to trial,

exercising that right will commonly render him ineligible for a § 3E1.1 reduction); *United States v. Cheatwood*, No. 22-4652, 2025 WL 18098, at *5 (4th Cir. Jan. 2, 2025) (denial of § 3E1.1 reduction affirmed where the defendant cross-examined each of the government witnesses and raised evidentiary objections to the documentary evidence the government sought to introduce); *United States v. Trevino*, 7 F.4th 414, 432 (6th Cir. 2021) ("Even where a defendant does 'admit substantial elements of the crime charged,'" § 3E1.1 does not apply "if the defendant contests even one factual element of the offense.").

This is therefore not the "rare situation" contemplated by Application Note 2 where a defendant proceeds to trial solely to preserve a purely legal or constitutional challenge unrelated to factual guilt. The defendant did not stipulate to the elements of the offense, plead guilty while preserving a discrete legal issue, or otherwise clearly accept responsibility before trial. Instead, as was his right, the defendant contested his guilty and proceeded to trial and held the government to its burden to prove that his statements constituted true threats. That litigation posture is fundamentally inconsistent with the acceptance-of-responsibility adjustment. *See* U.S.S.G. § 3E1.1 cmt. n.2.

Nor does the defendant's post-offense rehabilitation entitle him to the reduction. Acceptance of responsibility requires more than compliance with pretrial supervision or generalized expressions of regret after conviction. Here, even in his sentencing submission, the defendant continues to minimize his conduct by characterizing his repeated death threats as "venting," emphasizing that he did not intend to scare anyone, and suggesting the threats were simply the product of frustration during a difficult conversation. Def. Mem. at 1, 7; ECF No. 83-1 at 1. Those assertions are impossible to reconcile with a genuine acceptance of responsibility, particularly given the substantial fear and disruption his threats caused.

IV.    A Sentence of 24 Months' Incarceration is Appropriate

The government respectfully submits that a sentence of 24 months' imprisonment is appropriate in this case. The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for a Guidelines sentence.

The offense conduct in this case was serious and deeply troubling. On September 29, 2022, during the Call, the defendant made multiple, explicit threats to shoot and kill others after learning he was ineligible for unemployment benefits. His statements were not isolated or ambiguous; rather, they were sustained over the course of the Call and escalated in severity and specificity. Among other threats, the defendant stated, "If I go back to the post office, I'm gonna shoot somebody," and repeatedly suggested that the denial of benefits would cause him to "go to jail for killing somebody." He further asked whether "the city want[ed] [him] to kill five or six different people," and warned that "you might see this shit on TV tonight" and to "remember [his] name." Adding even more weight to the threats, the defendant referenced a specific location, stating that he would go to the DOL office on Schermerhorn or Livingston Street and "make a big fucking deal out of it," insinuating that he would commit violence significant enough to warrant appearing on television This was not a fleeting or impulsive remark, as the defendant suggests. Rather, over the course of a 45-minute call, the defendant repeatedly escalated his rhetoric into explicit threats of deadly violence, even after multiple opportunities to calm down or disengage

from the conversation.  Throughout the Call, the defendant emphasized his prior incarceration, his felony history, and his claimed indifference to returning to prison, stating that "it don't bother me to be in jail."  The defendant repeatedly framed violence as a foreseeable and even inevitable response to the denial of unemployment benefits which caused Hammond, the DOL, and the USPS to believe his threats were credible and to take responsive action.

The defendant's threats also caused real and lasting fear.  The defendant's statements led DOL employees to believe the threats were genuine and capable of being carried out, particularly in light of the defendant's repeated references to his criminal history and stated willingness to commit violence, including murder.  The defendant's threats also instilled significant fear among employees at the post office where he had previously worked before being terminated.  Reid's testimony underscored the profound fear and disruption caused by the defendant's conduct and demonstrates that his threats were perceived not as idle rhetoric, but as serious and potentially deadly.  As Reid described it, she and her colleagues were on "pins and needles" after learning of the defendant's threats.  These USPS employees believed they were in imminent danger and, as a result, feared for their lives each time the elevator doors opened, concerned that the defendant might emerge and kill them.  The defendant's conduct therefore caused not only fear to the individuals directly on the call, but broader disruption and harm to the entire USPS office who believed the threats could imminently be carried out.  The specificity, persistence, and escalation of the defendant's threats distinguish this case from fleeting or impulsive remarks, but instead reflect a deliberate disregard for the terror his words would inflict on his victims.

Nor should the Court accept the defendant's efforts to minimize the seriousness of the offense simply because the defendant did not ultimately act on his threats.  Section 875(c) criminalizes serious threats of violence precisely because of the fear, disruption, and danger they create before violence occurs.  The threats themselves are the crime.  Here, the defendant's conduct triggered a law enforcement response, frightened DOL and USPS employees, disrupted operations at the post office where he had previously worked, and prompted law enforcement to expend resources locating and arresting him as quickly as possible in order to mitigate the perceived threat and prevent potential violence.

Finally, the defendant's criminal history reflects a sustained disregard for the law and repeated failures to be deterred by prior convictions and terms of incarceration.  His record includes convictions for serious offenses such as rape, assault, robbery, attempted burglary, and possession of a loaded firearm, as well as conduct involving resistance to law enforcement and absconding from parole supervision.  Although many of these convictions are dated, they demonstrate a pattern of escalating and varied criminal conduct, including violence, sexual assault, and a weapons-related offense, followed by noncompliance with court-imposed supervision.  More troubling still, prior terms of incarceration failed to deter the defendant, as evidenced by his continued willingness to commit the instant offense and his constant refrain on the Call that returning to jail did not bother him.  This history underscores that prior leniency and custodial sentences have not meaningfully deterred the defendant from making repeated and specific threats

8

to shoot and kill both DOL and post office employees, warrant a sentence of 24 months' imprisonment.

V.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 24 months' imprisonment, which is the top end of the applicable Guidelines range.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ Antoinette N. Rangel
Antoinette N. Rangel
Assistant U.S. Attorney
(718) 254-7481

cc:    Kannan Sundaram, Esq. (By ECF and Email)
Clerk of the Court (NRM) (By ECF and Email)
United States Probation Officer (By Email)